# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------- x
In re                                    :    Chapter 11
                                         :
WASHINGTON MUTUAL, INC., et al.,[1]      :    Case No. 08-12229 (MFW)
                                         :
                      Debtors.           :    Re: Docket No. 1206
-------------------------------------------------x
JPMORGAN CHASE BANK, NATIONAL            :
ASSOCIATION,                             :
                                         :
                      Plaintiff,         :    Adversary No. 09-50551 (MFW)
                                         :
             v.                          :
                                         :
WASHINGTON MUTUAL, INC. AND              :
WMI INVESTMENT CORP.,                    :
                                         :
                      Defendants and     :
                      Counterclaimants,  :
                                         :
             and                         :
                                         :
FEDERAL DEPOSIT INSURANCE                :
CORPORATION,                             :
                                         :
                      Additional         :
                      Defendant for      :
                      Interpleader claim.:    Re: Docket No. 49
-------------------------------------------------x
WASHINGTON MUTUAL, INC. AND              :
WMI INVESTMENT CORP.,                    :
                                         :
                      Plaintiffs,        :    Adversary No. 09-50934 (MFW)
                                         :
             v.                          :
                                         :
JPMORGAN CHASE BANK, NATIONAL            :
ASSOCIATION,                             :
                                         :
                      Defendant.         :    Re: Docket No. 48
-------------------------------------------------x
```

# DEBTORS' OPPOSITION TO THE MOTION OF JPMORGAN
# CHASE BANK, N.A. FOR WITHDRAWAL OF THE REFERENCE
# OF THE ADVERSARY PROCEEDINGS PURSUANT TO 28 U.S.C. § 157(d)

---

[1]    The Debtors in these Chapter 11 cases and the last four digits of each Debtor's federal tax
identification numbers are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment
Corp. (5395).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................ 1

SUMMARY OF ARGUMENT ........................................................................... 2

BACKGROUND ............................................................................................... 5

I.     THE CLOSURE OF WMB, THE TITLE 12 RECEIVERSHIP, AND THE DC
       ACTION ............................................................................................... 5

II.    THE BANKRUPTCY CASES AND ADVERSARY PROCEEDINGS
       COMMENCED THEREIN ..................................................................... 6

       A.     JPMC's Adversary Proceeding ................................................... 7

       B.     JPMC Files More Than Forty Proofs of Claim with the Bankruptcy Court ........... 8

       C.     The Debtors' Turnover Action ................................................... 8

       D.     The Court's Ruling Denying JPMC's Motion to Stay and Rejecting JPMC's
              Arguments Concerning the FDI Act's Jurisdictional Bar ...................... 10

ARGUMENT ................................................................................................. 11

I.     MANDATORY WITHDRAWAL OF THE REFERENCE IS NOT
       WARRANTED ..................................................................................... 12

       A.     Withdrawal is Not Appropriate Because JPMC's Request is Not Timely ............ 12

       B.     Withdrawal is Not Mandatory Because Resolution of the Adversary
              Proceedings Will Not Require "Meaningful Consideration" of Federal
              Banking Laws .......................................................................... 14

              1.     *Capital Contributions* ................................................... 19

              2.     *Adjudication of Ownership of Disputed Assets Will Not Require
                     Substantial and Material Consideration of Federal Banking Laws* ......... 22

                     (a)     Debtors' Deposit Accounts ................................... 23

                     (b)     Tax Refunds ....................................................... 27

                     (c)     Trust Securities .................................................. 31

                     (d)     IP Claims ........................................................... 33

i

C.    The Bankruptcy Court Has Already Considered, and Ruled Inapplicable,
the FDI Act's Jurisdictional Bar .......................................................................... 34

II.    PERMISSIVE WITHDRAWAL IS NOT WARRANTED ................................................ 36

A.    The Core Nature of the Adversary Proceedings and Related *Pruitt* Factors
Militate Against Withdrawal ................................................................................ 38

B.    Withdrawal of the Reference Will Not Expedite The Debtors' Chapter 11
Bankruptcy Case .................................................................................................. 39

C.    It Will be More Efficient for the Bankruptcy Court to Resolve the
Adversary Proceedings ........................................................................................ 41

CONCLUSION ............................................................................................................................ 44

# TABLE OF AUTHORITIES

**Page**

## Cases

*AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.),*
117 B.R. 789 (Bankr. S.D.N.Y. 1990)...................................................................35

*All Star Int'l Trucks, Inc. v. Burlington Motor Carriers, Inc.*
*(In re Burlington Motor Holdings, Inc.),*
2002 U.S. Dist. LEXIS 718 (D. Del. Jan. 17, 2002) ..............................................16

*In re Allegheny Health Educ. and Research Found.,*
*Nos. CIV A 06-1469, 98-25773, 06-2031,*
2006 WL 3843572 (W.D. Pa. Dec. 19, 2006) ...............................................12, 13

*In re Am. Classic Voyages Co.,*
337 B.R. 509 (D.Del. 2006).................................................................................38

*Argus Mgmt. Group v. Gab Robins, Inc. (In re CVEO Corp.),*
327 B.R. 210 (Bankr. D. Del. 2005).....................................................................32

*Asurion Ins. Servs. v. Amp'd Mobile, Inc. (In re Amp'd Mobile, Inc.),*
377 B.R. 478 (Bankr. D. Del. 2007).....................................................................30

*In re Best Prods. Co.,*
1994 U.S. Dist. LEXIS 5088 (S.D.N.Y. Apr. 19, 1994) .........................................18

*Branch v. United States,*
69 F.3d 1571 (Fed. Cir. 1995) .............................................................................20

*In re CIS Corp.,*
140 B.R. 351 (S.D.N.Y. 1992) ............................................................................18

*California Housing Secur., Inc. v. United States,*
959 F.2d 955 (Fed. Cir. 1992) .............................................................................20

*In re Camden Ordnance Mfg. Co. of Arkansas, Inc.,*
245 B.R. 794 (E.D. Pa. 2000)..............................................................................15

*Celotex Corp. v. Edwards,*
514 U.S. 300 (1995) ...........................................................................................35

*Christianson v. Colt Industries Operating Corp.,*
486 U.S. 800 (1988) ...........................................................................................35

*In re City of Philadelphia Litig.,*
158 F.3d 711 (3d Cir. 1998) ...............................................................................35

*In re Columbia Gas Sys., Inc.,*
134 B.R. 808 (D.Del. 1991).................................................................................15

*In re Continental Airlines,*
   138 B.R. 442 (D. Del. 1992)..................................................................15, 27, 29, 33, 34, 39

*In re Continental Airlines, Inc.,*
   279 F.3d 226 (3d Cir. 2002) ...............................................................................................35

*In re Davis,*
   Bankr. No. 06-11746, Adversary No. 06-287, 2006 WL 3392167 .........................................37

*Matter of Delaware & Hudson Ry. Co.,*
   122 B.R. 887 (D. Del. 1991)...............................................................................................42

*Drew v. WorldCom, Inc.,*
   No. 06 Civ. 3407(JGK), 2006 WL 2129309 (S.D.N.Y. July 26, 2006) ...................................14

*EBS Pension, L.L.C. v. Edison Bros. Stores, Inc. (In re Edison Bros., Inc.),*
   268 B.R. 409 (Bankr. D. Del. 2001)....................................................................................30

*In re Enron Corp.,*
   295 B.R. 21 (S.D.N.Y. 2003) ..............................................................................................41

*In re FMI Forwarding Co., Inc.,*
   No. 00 .................................................................................................................................12

*Fagan v. City of Vineland,*
   22 F.3d 1283 (3d Cir. 1994) ...............................................................................................35

*In re Fairchild Aircraft Corp.,*
   126 B.R. 717 (Bankr. W.D. Tex. 1991)................................................................................27

*In re First RepublicbankCorp..,*
   1990 Bankr. LEXIS 2840 (Bankr. N.D. Tex. June 19, 1990) ................................................17

*In re Flanagan,*
   503 F.3d 171 (2d Cir. 2007) ...............................................................................................29

*Garrity v. Leffler (In re Neuman),*
   71 B.R. 567 (S.D.N.Y. 1987) ..............................................................................................16

*Golden Pac. Bancorp v. United States,*
   15 F.3d 1066 (Fed. Cir. 1994) ............................................................................................20

*Gross v. Bell Savings Bank PA SA,*
   974 F.2d 403 (3d Cir. 1992) ...............................................................................................27

*Hassett v. BancOhio Nat'l Bank (In re CIS Corp.),*
   172 B.R. 748 (S.D.N.Y. 1994) .............................................................................17, 23, 25, 26

*IRS v. CM Holdings, Inc. (In re CM Holdings, Inc.),*
   221 B.R. 715 (D. Del. 1998).........................................................................................12, 29

*In re IT Group, Inc.,*
   No. 02-10118 MFW, 2007 WL 211179, at *1 (D.Del. Jan. 26, 2007)..............................37, 38

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
    458 F.3d 244 (3d Cir. 2006), cert. denied, 127 S. Ct. 1878 (2007) ............................... 41

*Krebs Chrysler-Plymouth v. Valley Motors, Inc.*,
    141 F.3d 490 (3d Cir. 1998) ............................................................................................ 33

*Lambert v. Blackwell*,
    387 F.3d 210 (3d Cir. 2004) ............................................................................................ 35

*Moglia v. Quantum Industrial Partners, LDC (In re Outboard Marine Corp.)*,
    2003 WL 21697357 (N.D. Ill. July 21, 2003) ................................................................. 26

*Montana v. United States*,
    440 U.S. 147 (1979) ........................................................................................................ 36

*In re New York Trap Rock Corp.*,
    158 B.R. 574 (S.D.N.Y. 1993) ........................................................................................ 14

*Nisselson v. Drew Indus. (In re White Metal Rolling & Stamping Corp.)*,
    222 B.R. 417 (Bankr. S.D.N.Y. 1998) ............................................................................ 30

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982) .......................................................................................................... 39

*OHC Liquidation Trust v. Am. Bankers Ins. Co. (In re Oakwood Homes Corp.)*,
    2005 Bankr. LEXIS 429 (Bankr. D. Del. Mar. 18, 2005) ............................................... 31

*O'Melveny & Myers v. F.D.I.C.*,
    512 U.S. 79 (1994) .......................................................................................................... 18

*Oakridge Consulting, Inc. v. United States (In re Consol. FGH Liquidating Trust)*,
    325 B.R. 564 (Bankr. S.D. Miss. 2005) .......................................................................... 30

*In re Oakwood Homes Corp.*,
    Civil Action No. 06-436-JJF, 2007 WL 2071730 (D. Del. July 17, 2007) ................. 37, 39

*In re Orion Pictures Corp.*,
    4 F.3d 1095 (2nd Cir. 1993), cert. dismissed, 511 U.S. 1026, 114 S.Ct. 1418 ............... 37

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2005) ............................................................................................ 29

*Pardo v. Gonzaba (In re APF Co.)*,
    308 B.R. 183 (Bankr. D. Del. 2004) ................................................................................ 32

*Pratt v. Ventas, Inc.*,
    365 F.3d 514 (6th Cir. 2004) ........................................................................................... 35

*In re Pruitt*,
    910 F.2d 1160 (3d Cir. 1990) .......................................................................... 12, 37, 38, 39, 42

*Rosa v. R.T.C.*,
    938 F.2d 383 (3d Cir. 1991) ............................................................................................ 20

*In re Sahni*,
    227 B.R. 748 (D. Kan. 1998)..............................................................................17

*In re Smith-Corona Corp.*,
    205 B.R. 712 (D. Del. 1996)........................................................................12, 15

*Southern Pac. Ry. Co. v. United States*,
    168 U.S. 1 (1897)...........................................................................................36

*Stanziale v. Rite Way Meat Packers, Inc. (In re CFP Liquidating Estate)*,
    2009 Bankr. LEXIS 1536 (Bankr. D. Del. May 21, 2009)......................................30

*Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.)*,
    269 B.R. 481 (Bankr. E.D.N.Y. 2001) ................................................................30

*United States v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*,
    295 B.R. 222 (D.N.J. 2003) ..............................................................................29

*United States v. MCorp Fin. (In re MCorp Fin)*,
    170 B.R. 899 (S.D. Tex. 1994) ..........................................................................28

*Matter of Vicars Ins. Agency, Inc.*,
    96 F.3d 949 (7th Cir. 1996) ..............................................................................27

*In re Westmoreland Coal Co.*,
    221 B.R. 512 (D. Colo. 1998)......................................................................37, 41

*In re Winstar Communications, Inc., Civ.A.04-928-JJF*,
    2004 WL 2713101 (D.Del. Nov. 16, 2004) ..........................................................38

*Young v. Snider, No. CIV.A. 94-0005*,
    1994 WL 81955 (E.D. Pa. Mar. 11, 1994) ......................................................12, 13

## <u>Statutes</u>

11 U.S.C. § 1121(d)...........................................................................................40

11 U.S.C. §365 ................................................................................................30

11 U.S.C. § 365(o) ...........................................................................................33

11 U.S.C. § 501 ...............................................................................................26

11 U.S.C. § 507 ...............................................................................................21

11 U.S.C. § 542(b) ...........................................................................................23

11 U.S.C. § 544 ...............................................................................................31

11 U.S.C. § 547 ...............................................................................................31

11 U.S.C. § 548 ...............................................................................................31

11 U.S.C. § 1121 .............................................................................................40

11 U.S.C. § 1129 ................................................................................... 21

12 U.S.C. § 1821(d)(11)(A) ............................................................. 19, 20

12 U.S.C. § 1821(d)(13)(D) ................................................................. 34

12 U.S.C. § 1821(d)(2)(G)(II) .............................................................. 33

12 U.S.C. § 1821(d)(5)(A)(i) .................................................................. 6

12 U.S.C. § 1821(d)(6)(A) ...................................................................... 6

12 U.S.C. § 1828(u) ........................................................................ 21, 22

12 U.S.C. § 371c(b)(7) .......................................................................... 24

28 U.S.C. § 1412 .................................................................................. 14

28 U.S.C. § 157(a) ................................................................................ 11

28 U.S.C. § 157(b) .......................................................................... 16, 38

28 U.S.C. §§ 157(b)(2)(A) - (O) .......................................................... 16

28 U.S.C. § 157(b)(2)(E) ...................................................................... 23

28 U.S.C. § 157(d) ................................................................................ 11

28 U.S.C. § 158 .................................................................................... 35

Fed. R. Bankr. P. 7087 .......................................................................... 14

Treas. Reg. 1.1502-77(a) ...................................................................... 30

## PRELIMINARY STATEMENT

Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment," and with WMI, "Debtors") file this opposition to the motion (the "Motion") (Docket No. 1206) of JPMorgan Chase Bank, National Association ("JPMC"), to withdraw the reference to the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") with respect to two adversary proceedings: one commenced by JPMC itself and another commenced by the Debtors seeking the turnover of more than $4 billion in deposits formerly kept with their subsidiary bank and now wrongfully withheld by JPMC. After commencing its own adversary proceeding in the Bankruptcy Court by filing a complaint that asserts that the Bankruptcy Court has jurisdiction "pursuant to 28 U.S.C. §§ 2201 and 2202, 28 U.S.C. § 1334, 28 U.S.C. § 157, and Bankruptcy Rule 7001" and that venue is "proper pursuant to 28 U.S.C. § 1409(a)" and filing more than 40 proofs of claim with the Bankruptcy Court, in a telling sign that JPMC will stop at nothing to derail and delay the Bankruptcy Court proceedings, JPMC filed this motion nearly three months later. JPMC has then proceeded to participate significantly in both adversary proceedings, including requiring the Debtors to answer and counterclaim to its complaint, and proposing extensive schedules for the taking of discovery and motion practice. Even more telling than the timing of the Motion relative to JPMC's commencement of its own adversary proceeding is the fact that JPMC filed this meritless Motion at nearly midnight on the night before the Bankruptcy Court heard argument on, and denied, motions by the FDIC to stay, and by JPMC to transfer or stay, the adversary proceedings. Those motions were appropriately denied by the Bankruptcy Court because they were premised upon an inapplicable jurisdictional bar. The reasoning expressed in that ruling applies with equal force to this Motion, yet this has not deterred JPMC from proceeding with this Motion as part of its overall delay strategy so that it can continue to unjustifiably withhold the Debtors' assets – including the $4 billion in deposits

– while causing the bankruptcy estates to incur significant administrative expenses and frustrating the Debtors' effort to make long-awaited distributions to their respective creditors who have not yet realized any recovery. The Motion, an untimely, transparent attempt at forum shopping and delay, should be denied.

## SUMMARY OF ARGUMENT

JPMC fails to carry its significant burden to warrant withdrawal of the adversary proceedings. The Motion asserts that withdrawal of the reference is mandatory because the Bankruptcy Court will need to substantially and materially consider (i) a jurisdictional bar imposed by the Federal Deposit Insurance Act (the "FDI Act"), and (ii) federal banking laws in resolving the pending adversary proceedings. Both assertions are patently false.

The Bankruptcy Court has already disposed of the former, finding that the purported jurisdictional bar, as interpreted by controlling Third Circuit law did not apply to the adversary proceedings. The applicable law in the Third Circuit on this issue is clear and unequivocal, and the Bankruptcy Court's application of that law is sound. Thus, JPMC's argument should be rejected as a basis for withdrawal of the reference. JPMC's argument that the Bankruptcy Court will need to "substantially and materially consider federal banking laws" is similarly groundless. Before assessing JPMC's specific assertions of non-bankruptcy federal law implications, JPMC's argument must be viewed in light of two related facts. One, JPMC recently invented this meritless argument after considering the Bankruptcy Court the appropriate place to file its own adversary proceeding and more than 40 proofs of claims. Two, it is clear that both adversary proceedings comprise core bankruptcy proceedings for which the Bankruptcy Court is uniquely equipped to resolve. Specifically, the Debtors assert the following core claims: two turnover actions, nine avoidance actions seeking to avoid preferential and fraudulent transfers, disallowance of bankruptcy claims under the Bankruptcy Code, and two counts seeking

2

determinations as to whether certain assets are property of the Debtors' estates. Similarly, JPMC seeks declarations regarding the proper ownership of assets.

Notwithstanding the fact that these claims are squarely within the Bankruptcy Court's exclusive jurisdiction over property of the Debtors' estates and claims to determine property of the estates, JPMC attempts to argue that the resolution of such claims will necessarily require substantial and material consideration of non-Title 11 federal laws. In support of its argument, JPMC refers to inapplicable federal banking statutes and inapposite case law in a transparent attempt to divert the Court's attention from the fact that its assertions have no substance, and raise no conflict or complex issue of law requiring significant interpretation. To the extent the Bankruptcy Court, in adjudicating the adversary proceedings, will be asked to give any consideration to federal banking laws, that consideration will be, at most, tangential, and certainly will not meet the "meaningful consideration" standard implemented by this district in assessing mandatory withdrawal of the reference.

Indeed, JPMC's very own actions are perhaps the most telling admission that the issues in the adversary proceedings have little, if anything, to do with federal banking law. As noted above, it was JPMC that first submitted to the Bankruptcy Court's jurisdiction by filing an adversary proceeding and more than 40 proofs of claim, putting in the hands of the Bankruptcy Court the issue of ownership of numerous assets. JPMC admitted in its complaint that the Bankruptcy Court had jurisdiction and that venue was proper, and never said a word about there being a need to consider federal banking law. That the Debtors would counterclaim – and assert their ownership over those assets – could hardly have been unexpected. JPMC then pursued such litigation in the Bankruptcy Court for months. Equally telling is the fact that in connection with the Debtors' action seeking turnover of their own deposits, JPMC filed two memoranda of

law with the Bankruptcy Court, ***but never once said a word about federal banking law*** supposedly governing resolution of the dispute. Subsequently, when JPMC joined the FDIC's motion to dismiss or stay the adversary proceedings, seeking a transfer to Washington D.C., as it seeks to do here impermissibly, JPMC raised only the purported jurisdictional bar and again failed to assert that federal banking law would have to be applied. In short, JPMC not only affirmatively asserted on multiple occasions that the Bankruptcy Court was the proper forum to adjudicate the issues raised in the adversary proceedings, but also failed on numerous other occasions to assert its recently contrived "federal banking law" argument.

JPMC also claims that permissive withdrawal of the reference is appropriate, but the relevant factors all require denial of JPMC's Motion. As a threshold matter, as discussed above, the Debtors' claims are comprised of core bankruptcy actions. JPMC "does not object" to this characterization – because it cannot. As for the issue of timing, JPMC filed its motion nearly three months after filing its own complaint and proofs of claim and nearly a month after the Debtors answered and asserted their counterclaims. If this timeline alone does not implicate obvious forum shopping, JPMC's actions, including filing this Motion on the literal eve of the hearing on its and the FDIC's motion to stay or transfer the adversary proceedings, and forging ahead with this Motion without modification notwithstanding the Bankruptcy Court's finding concerning the (in) applicability of the FDI Act's jurisdictional bar, leave no question as to its motive. Finally, and perhaps most importantly, expediting the bankruptcy process calls out for denying JPMC's Motion. The Debtors, and their creditors, are badly in need of their cash deposits to construct a chapter 11 plan and have made progress in contesting JPMC's stubborn refusal to turn those funds over. However, JPMC, unconcerned with the expedition of the Debtors' bankruptcy cases, would like nothing more than to have central issues in the Debtors'

bankruptcy proceedings ripped from the Bankruptcy Court and delivered to a new court to further delay the ultimate, necessary resolution of the disputes between the parties. The Motion should be denied and the Debtors' efforts to resolve the adversary proceedings and its own chapter 11 bankruptcy case should be allowed to proceed.

## BACKGROUND

### I.    THE CLOSURE OF WMB, THE TITLE 12 RECEIVERSHIP, AND THE DC ACTION

On September 25, 2008, Washington Mutual Bank ("WMB") was closed and placed into receivership by the Federal Deposit Insurance Corp. (the "FDIC"). On the same day, the FDIC purportedly sold substantially all of WMB's assets, including the stock of its subsidiary Washington Mutual Bank fsb ("WMB fsb"), to JPMC for $1.88 billion, and the assumption of all of WMB's deposit liabilities, including those deposit liabilities owed to the Debtors (the "P&A Transaction"), pursuant to that certain Purchase and Assumption Agreement Whole Bank (the "P&A Agreement").[2] Shortly thereafter, JPMC assumed all of WMB fsb's deposit liabilities by merging WMB fsb with its own banking operations.

In connection with WMB's receivership, as required by section 11(d) of the FDI Act (12 U.S.C. § 1821(d)), the FDIC set December 30, 2008, as the last day to file claims against WMB. On January 23, 2009, the FDIC disallowed the Debtors' claims in a one-page Notice of Disallowance. Because the FDI Act required the Debtors to challenge the disallowance of claims within 60 days,[3] Debtors filed a Complaint in the District Court for the District of

---

[2]    (P&A Agreement, JPMC Appx. at A1 – A44). To avoid unnecessary duplication, where applicable, the Debtors respectfully refer the Court to documents included in the Appendix in Support of JPMC's Motion attached to the Motion.

[3]    The Disallowance Notice stated in part: "[I]f you do not agree with this disallowance, you have the right to file a lawsuit on your claim … in the United States District (or Territorial) Court for the District within which the failed Institution's principal place of business was located or the (footnote continued)

Columbia, on March 20, 2009,[4] challenging the FDIC's disallowance of claims (the "DC Action").[5] That case has proceeded on a comparatively slow pace. The FDIC, in its capacity as receiver, issued its answer to the Debtors' complaint, along with a motion to dismiss in which it seeks to have dismissed all of the Debtors' claims other than those for which it filed proofs of claim for, including the Debtors' claim to avoid certain capital contributions transferred to WMB prior to its closure, on June 11, 2009. The deadline for the Debtors' response is July 16, 2009. Importantly, there have been no decisions issued, no discovery taken, and no oral argument presented in the DC Action. Although JPMC has moved to intervene, the Debtors have contested the motion, and JPMC is currently not a party to the DC Action.

## II.    THE BANKRUPTCY CASES AND ADVERSARY PROCEEDINGS COMMENCED THEREIN

On September 26, 2008, (the "Petition Date") the Debtors each commenced a voluntary case pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the Bankruptcy Court. Currently, there are two multi-billion dollar pending adversary proceedings to which JPMC is party.

---

United States District Court for the District of Columbia within 60 days from the date of this notice. **IF YOU DO NOT FILE A LAWSUIT … BEFORE THE END OF THE 60-DAY PERIOD, THE DISALLOWANCE WILL BE FINAL, YOUR CLAIM WILL BE FOREVER BARRED AND YOU WILL HAVE NO FURTHER RIGHTS OR REMEDIES WITH RESPECT TO YOUR CLAIM.**" (Emphasis and capitalization in original.)

[4]    (Debtors' Complaint, JPMC Appx. at A68 – A106).

[5]    Once a creditor files a claim with the agency, the FDIC has 180 days to either allow or disallow it. 12 U.S.C. § 1821(d)(5)(A)(i). A claimant who is dissatisfied with the agency's determination then has 60 days either to request administrative review or to file suit on the claim. 12 U.S.C. § 1821(d)(6)(A). The claimant is authorized to bring suit either in "the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia." *Id.*

### A.    JPMC's Adversary Proceeding

On March 24, 2009, JPMC commenced an action, captioned *JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc. et al.*, Adv. Proc. No. 09-50551 (MFW) (the "JPMC Adversary Proceeding") (Docket No. 807), in which it asserts an ownership interest in various assets that it allegedly purchased from the FDIC pursuant to the P&A Agreement, including the Trust Securities, Tax Refunds, the Debtors' Deposit Accounts, Goodwill Litigation, Rabbi Trusts, Pension and 401(k) Plans, Bank Owned Life Insurance Policies, Visa Shares, and certain Intangible Assets (each as defined in the complaint filed in the JPMC Adversary Proceeding).[6] There is no mention in JPMC's complaint about the issues raised by the JPMC Adversary Proceeding being governed by federal banking law or the Bankruptcy Court lacking the capacity to decide the issues.  To the contrary, in its complaint, JPMC asserts that the Bankruptcy Court has jurisdiction "pursuant to 28 U.S.C. §§ 2201 and 2202, 28 U.S.C. § 1334, 28 U.S.C. § 157, and Bankruptcy Rule 7001" and that venue is "proper pursuant to 28 U.S.C. § 1409(a)."  JPMC has neither disclaimed those allegations nor withdrawn that complaint.  On May 22, 2009, the Debtors filed their answer to JPMC's complaint including eighteen counterclaims (the "Counterclaims") asserting, among other things, affirmative claims under the Bankruptcy Code's avoidance provisions and under state law as incorporated by the Bankruptcy Code (*i.e.*, 11 U.S.C. §§ 541, 544, 547, 548), for the avoidance of more than $10 billion in preferential and fraudulent prepetition transfers of the Debtors' assets to WMB that were subsequently transferred to JPMC.[7]

---

[6]    (JPMC Complaint, JPMC Appx. at A145 – A211).

[7]    (Debtors' Answer and Counterclaims, JPMC Appx. at A212 – A345).

**B.    JPMC Files More Than Forty Proofs of Claim with the Bankruptcy Court**

Confirming its intent to submit to the equitable jurisdiction of the Bankruptcy Court and its desire to see the Bankruptcy Court adjudicate disputed issues between JPMC and the Debtors, on March 30, 2009, just six days after commencing the JPMC Adversary Proceeding, JPMC filed more than 40 proofs of claim with the Bankruptcy Court.[8]  Separate proofs of claim were filed for each of the aforementioned assets that are the subject of the JPMC Adversary Proceeding.  Among the Debtors' Counterclaims is a request that all such claims be disallowed pursuant to section 502(d) of the Bankruptcy Code.

**C.    The Debtors' Turnover Action**

The second adversary proceeding was commenced by the Debtors on April 27, 2009, under the Bankruptcy Code's turnover provision (11 U.S.C. § 542(b)), captioned *Washington Mutual, Inc. et al.* v. *JPMorgan Chase Bank, N.A.*, Adv. Proc. No. 09-50934 (MFW) (the "Turnover Action," and with the JPMC Adversary Proceeding, the "Adversary Proceedings") (Docket No. 960).[9]  In the Turnover Action, the Debtors assert an unquestionable right to approximately $4 billion in deposits formerly held at WMB and at WMB fsb (the "Deposits"), demanding the payment of those funds to the Debtors' estates.[10]  JPMC filed a motion to dismiss

---

[8]    Attached as exhibit A hereto is an Appendix in Support of the Debtors' Opposition to the Motion. (JPMC's Proofs of Claim, Debtors' Appx. at B1 – B207.)

[9]    (Debtors' Turnover Action Complaint, Debtors' Appx. at B208 – B228.)

[10]    More than five months earlier, on October 14, 2008, the Debtors entered into a stipulation with JPMC (the "Account Stipulation"), pursuant to which JPMC agreed with the Debtors that the Deposits, were deposit accounts of the Debtors.  The Account Stipulation provided further that the Deposits were to remain subject to claims, rights and remedies that JPMC may have had, and afforded JPMC replacement liens to the extent of any such interests.  Although the motion seeking approval of the Account Stipulation that the Debtors filed with JPMC's support with the Bankruptcy Court was subsequently withdrawn on January 26, 2009, JPMC never once asserted that the Bankruptcy Court was not the proper court to resolve the Deposits or that substantial or material considerations of federal banking law would be implicated.

the Turnover Action on May 13, 2009, and reply brief to the Debtors' opposition on June 3, 2009,[11] in which JPMC argued that there was a genuine dispute as to ownership of the Deposits. None of the supposed disputes that JPMC identified in their briefs involved the substance of the FDI Act. In fact, other than the asserted applicability of the FDI Act's jurisdictional bar (since rejected by the Bankruptcy Court), JPMC's briefs do not even cite to the FDI Act at all, and contain not a word about "federal banking law" controlling the underlying issues. At the hearing held on June 24, 2009 (the "June 24 Hearing"), the Bankruptcy Court was presented with oral argument on JPMC's motion to dismiss the Turnover Action, and JPMC again argued that the Deposits were subject to dispute, but did not identify any purported disputes under the FDI Act. The Court denied the motion to dismiss, finding that the Debtors' complaint and accompanying exhibits describe exactly the type of debt contemplated by section 542(b) of the Bankruptcy Code, without any indication of a genuine dispute as to "the title to the . . . deposit accounts." (Tr. 6/24/09 at 117.)[12] On July 6, 2009, JPMC answered the Debtors' complaint and asserted counterclaims which are largely duplicative of the claims asserted in the JPMC Adversary Proceeding. In its answer, JPMC asserts that the Bankruptcy Court has jurisdiction "pursuant to 28 U.S.C. §§ 2201 and 2202, 28 U.S.C. § 1334 and 1335, 28 U.S.C. § 157, and Bankruptcy Rules 7013, 7019 and 7020."[13]

---

[11]    (JPMC's Motion to Dismiss Turnover Action Complaint and Reply Brief, Debtors' Appx. at B229 – B267.)

[12]    (June 24 Hearing Transcript, Debtors' Appx. at B268 – B385.) On May 19, 2009, Debtors filed their Motion for Summary Judgment in the Turnover Action, in which they present extensive and compelling evidence demonstrating that they in fact are owed the Deposits and that they are entitled to have JPMC promptly remit those funds. (Debtors' Motion for Summary Judgment, Debtors' Appx. at B386 – B416 (exhibits omitted).)

[13]    (JPMC's Answer and Counterclaims to Debtors' Turnover Action Complaint, Debtors' Appx. at B417 – B466.)

In addition to commencing the JPMC Adversary Proceeding, JPMC has participated meaningfully in both Adversary Proceedings, including engaging in discussions with the Debtors concerning extensive schedules for the taking of discovery and motion practice.

**D.      The Court's Ruling Denying JPMC's Motion to Stay and Rejecting JPMC's Arguments Concerning the FDI Act's Jurisdictional Bar**

JPMC and the FDIC filed motions to stay the Adversary Proceedings, in which both parties argued that the Turnover Action and Debtors' Counterclaims are barred jurisdictionally under section 1821(d)(13)(D) of the FDI Act.  Well after the matter was fully briefed by all three parties, JPMC filed this Motion on the literal eve of the June 24 Hearing.  Although the Motion was not on the Court's calendar, JPMC – in a transparent attempt to further persuade (or perhaps intimidate) the Bankruptcy Court to stay or send the adversary proceedings to Washington D.C. – specifically referenced this Motion in the course of its argument several times.  (Tr. 6/24/09 at 21, 83, 85.)  There was extensive oral argument presented by JPMC and the FDIC; the Bankruptcy Court properly denied the motions to dismiss, stay, or transfer.[14]  The Bankruptcy Court, applying controlling Third Circuit authority, found that the FDI Act applies to claims against the FDIC for assets in receivership, and that the Debtors' claims against a successor bank, JPMC, are appropriately before the Bankruptcy Court.  (Tr. 6/24/09 at 93-94.)  The Bankruptcy Court also rejected arguments by the FDIC and JPMC invoking the "first filed rule" as an alternative basis to defer to the DC Action, reasoning that the Bankruptcy Court has "exclusive" jurisdiction over the Turnover Action and the Debtors' Counterclaims and noting that the DC Action and the Adversary Proceedings do not involve "the same claims."  (Tr. 6/24/09 at 94.)

---

[14]      (Bankruptcy Court's Orders Denying Motions of JPMC and FDIC to Stay Adversary Proceedings, Debtors' Appx. at B467 – B471.)

JPMC filed a motion to dismiss the Debtors' Counterclaims prior to the Bankruptcy Court's recent ruling, and its position is based on the identical argument that the Bankruptcy Court has now rejected—*i.e.*, that section 1821(d)(13)(D) of the FDI Act bars the Debtors' Counterclaims against JPMC.[15] In light of the Court's ruling that the bar does not apply, the Debtors contacted JPMC, by email dated June 26, 2009, and requested that it withdraw the motion to dismiss. JPMC declined to do so without explanation, and has elected instead to continue to pursue an argument that the Bankruptcy Court has specifically rejected – with respect to both the motion to dismiss the Counterclaims and the instant Motion. The Debtors filed their opposition to JPMC's motion to dismiss on July 2, 2009.[16]

## ARGUMENT

Pursuant to 28 U.S.C. § 157(a), district courts may refer cases under title 11 and matters connected to bankruptcy cases to the bankruptcy court for disposition. Under section 157(d), the referred proceeding can be withdrawn from the bankruptcy court and returned to the district court only under limited circumstances. Permissive withdrawal of the reference is warranted "for cause shown." Mandatory withdrawal of the reference is warranted "if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d). In either event, the motion to withdraw must be "timely." *Id.*

Importantly, courts narrowly construe section 157(d) to prevent litigants from using it as an "escape hatch" out of bankruptcy court; otherwise, bankruptcy matters could routinely be

---

[15] (JPMC Brief in Support of Motion to Dismiss Debtors' Counterclaims, JPMC Appx. at A346 – A378).

[16] (Debtors' Opposition Brief to JPMC's Motion to Dismiss Debtors' Counterclaims, Debtors' Appx. at B472 – B500.)

removed to the district court which clearly was not what Congress's intended. *See In re Smith-Corona Corp.*, 205 B.R. 712, 714 (D. Del. 1996). The party seeking withdrawal of the reference, in this case JPMC, bears the significant burden of establishing that withdrawal is appropriate. *IRS v. CM Holdings, Inc. (In re CM Holdings, Inc.)*, 221 B.R. 715, 721 (D. Del. 1998). JPMC fails to satisfy this burden with respect to both mandatory and permissive withdrawal.

## I.    MANDATORY WITHDRAWAL OF THE REFERENCE IS NOT WARRANTED.

### A.    Withdrawal is Not Appropriate Because JPMC's Request is Not Timely

JPMC's Motion does not meet the threshold requirement set forth in 28 U.S.C. § 157(d) that such a motion be timely. A motion to withdraw should be made "as soon as possible" or at the "first reasonable opportunity" after it is apparent that there is a basis for such a motion. *Young v. Snider*, No. CIV.A. 94-0005, 1994 WL 81955, at *2 (E.D. Pa. Mar. 11, 1994); *see also In re Pruitt*, 910 F.2d 1160, 1171 (3d Cir. 1990) (Mansmann, J., concurring). "Delay for tactical reasons, such as forum shopping, or which prejudices the opposing party or the administration of justice, can be grounds for denying a withdrawal motion as untimely." *In re FMI Forwarding Co., Inc.*, No. 00 B. 41815(CB), 2005 WL 147298, at *6 (S.D.N.Y. Jan. 24, 2005).

It cannot be disputed that JPMC, which over three months ago initiated the very action it now seeks to withdraw, has not sought to withdraw the reference "at the first reasonable opportunity." Rather, JPMC waited until after it filed over 40 proofs of claim and at least 17 substantive pleadings, including a motion to dismiss the Turnover Action, a motion to dismiss the Counterclaims, a motion to transfer or stay the Adversary Proceedings, and other motions and pleadings. Given that JPMC intentionally initiated the JPMC Adversary Proceeding having all the information it now relies upon to withdraw the reference, its Motion should be denied as untimely. *See, e.g., In re Allegheny Health Educ. and Research Found.*, Nos. CIV A 06-1469, 98-25773, 06-2031, 2006 WL 3843572, at *2 (W.D. Pa. Dec. 19, 2006) (motion was untimely

12

where arguments in support thereof "could have been made the day that the adversary proceeding complaint was filed"); *Young*, 1994 WL 81955, at *3 ("movants did not request withdrawal of the reference 'as soon as possible' after they had notice of the grounds for withdrawal and [], therefore, the late request for withdrawal is untimely and has resulted in waiver").

Furthermore, JPMC's inexcusable delay has prejudiced the Debtors and the estates.  The Debtors and the Official Committee of Unsecured Creditors have expended significant resources litigating these matters in the Bankruptcy Court, and the Bankruptcy Court has dedicated significant time to understanding the issues and has already ruled upon the motion to dismiss the Turnover Action and the motion to stay the Adversary Proceedings.  Withdrawing the reference at this stage will only serve to delay the proceedings and cause prejudice.  *See, e.g., Allegheny Health Educ. and Research Found.*, 2006 WL 3843572, at *2 (party's delay in filing withdrawal motion would delay proceedings and prejudice Trustee and courts, which had already dedicated substantial time and resources to proceedings); *see also supra* Part II.B .

Finally, there are numerous indicia that JPMC is partaking unabashedly in forum shopping.  First, JPMC's filing of the Motion on the eve of the June 24 Hearing demonstrates that JPMC sought to use withdrawal of the reference as a safeguard against an adverse ruling on its motion to transfer or stay.  Now, JPMC has already argued (unsuccessfully) in its papers and at the June 24 Hearing that the Adversary Proceedings should be transferred to the District Court for the District of Columbia.  *See* JPMC Response to FDIC Motion to Stay at 2 ("transfer would be appropriate because [the JPMC Adversary Proceeding] is 'materially on all fours ' with the D.C. Action"); Tr. June 24 Hearing at 60 ("We have suggested that the proper -- a preferable course may be to transfer these actions to D.C., so they can all be adjudicated together.").  The

13

Bankruptcy Court effectively rejected these arguments in finding that the "first-filed" rule was inapplicable to the Adversary Proceedings. (*See* Tr. June 24 Hearing at 94.) JPMC is using this Motion as an end run around the Bankruptcy Court's refusal to transfer or stay the Adversary Proceedings. Moreover, putting aside issue preclusion, which bars any contemplated JPMC transfer request (*see infra* Part II.C.), JPMC could have moved the Bankruptcy Court to transfer the Adversary Proceedings pursuant to Bankruptcy Rule 7087 which provides for transfer of adversary proceedings pursuant to 28 U.S.C. § 1412. Fed. R. Bankr. P. 7087. However, given the Bankruptcy Court's ruling, JPMC chooses instead to proceed with the Motion to achieve what it has already been denied – transfer to the District Court for the District of Columbia. The court should not countenance such gamesmanship. *See, e.g., In re New York Trap Rock Corp.*, 158 B.R. 574, 577 (S.D.N.Y. 1993) (motion untimely where ***three months*** that elapsed between filing and motion were "rich with events" suggesting forum shopping); *Drew v. WorldCom, Inc.*, No. 06 Civ. 3407(JGK), 2006 WL 2129309, at *3 (S.D.N.Y. July 26, 2006) (denying motion where the timing "gives rise to a strong inference that [moving party] is attempting to forum shop" because motion was filed three weeks after opposing party filed significant motions in the Bankruptcy Court and motion contradicted moving party's prior admission that claim was "core proceeding" over which Bankruptcy Court had jurisdiction).

Because JPMC's Motion is not timely and was motivated purely by tactical reasons and forum shopping, the Court should deny it outright.

**B.  Withdrawal is Not Mandatory Because Resolution of the Adversary Proceedings Will Not Require "Meaningful Consideration" of Federal Banking Laws**

In an effort to avoid the obvious conclusion that the Bankruptcy Court should decide core bankruptcy issues, JPMC attempts to gin up purported issues of federal banking law supposedly implicated by the Adversary Proceedings. However, the law in this district is clear that the mere

14

specter of tangentially-related non-Title 11 federal law cannot support mandatory withdrawal of the reference. To the contrary, mandatory withdrawal is only appropriate when consideration of law outside of the Bankruptcy Code is both (1) *necessary* for the resolution of the case or proceeding; and (2) *substantial and material* to the resolution of the case or proceeding. *In re Columbia Gas Sys., Inc.*, 134 B.R. 808 (D. Del. 1991) (denying motion for withdrawal because substantial and material consideration of the Natural Gas Policy Act and Decontrol Act not required to adjudicate debtor's motion).

With respect to the latter requirement, the consideration of non-Title 11 federal law will only be considered "substantial and material" where it requires "meaningful consideration" as opposed to the "simple application" of well-settled law. *See Smith-Corona*, 205 B.R. at 714 (finding "straightforward application" of relevant ERISA provisions did not warrant mandatory withdrawal even though "an analysis of the interplay between ERISA and the Bankruptcy Code is involved"); *In re Camden Ordnance Mfg. Co. of Arkansas, Inc.*, 245 B.R. 794, 806 (E.D. Pa. 2000) (denying motion to withdraw reference where issue of law was "well settled" did not "require complex interpretation of non-title 11 federal law"). Some courts have articulated the standard as requiring that the non-bankruptcy issue be one of "first impression" that is "sharply in conflict" with Title 11. *See, e.g., In re Continental Airlines*, 138 B.R. 442 (D. Del. 1992) (determining that bankruptcy court was perfectly capable of making determination concerning validity of settlement of debtor's ERISA liability).

Here, JPMC has asserted in the JPMC Adversary Proceeding a litany of claims seeking rulings that certain disputed assets are owned by JPMC pursuant to the P&A Agreement. Rather than implicating the FDI Act or any other non-Title 11 federal law, the beginning and end of the matter is the Bankruptcy Court, which has exclusive jurisdiction to decide whether an asset is

property of the estate. *See* Tr. June 24 Hearing at 95 ("I do have exclusive jurisdiction to decide

what is property of the estate. If I determine that the property at issue is property of the estate,

then this Court has exclusive jurisdiction over that property, and over claims, counterclaims,

other claims against the estate."); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 573-74

(S.D.N.Y. 1987) ("[F]orays to other forums to determine what is property of the estate for

purposes of bankruptcy law are not only time-consuming, but disrupt the heart of the duties that

the [bankruptcy] court is designed to perform.").

Likewise, nine of the Debtors' Counterclaims are avoidance actions authorized by chapter

5 of the Bankruptcy Code. (Counterclaims 1-6, 8-10, & 12.) One is a turnover proceeding and

another is a claim disallowance count, pursuant to sections 542 and 502 of the Bankruptcy Code,

respectively. (Counterclaims 11, 13.) Two more are declaratory judgment actions seeking

rulings that certain assets are property of the Debtors' bankruptcy estates. (Counterclaims 7, 12.)

Clearly, these core bankruptcy claims[17] are within the Bankruptcy Court's special expertise and

involve issues with which the Bankruptcy Court is intimately familiar. It cannot be seriously

disputed that these bankruptcy causes of action, creatures of the Bankruptcy Code itself, should

be adjudicated by the Bankruptcy Court.

With respect to the Turnover Action, also a core bankruptcy proceeding, JPMC has

already briefed and argued a motion to dismiss without once raising any issue of federal banking

---

[17]    The Debtors' claims are "core proceedings" as defined under 28 U.S.C. 157(b) because they are
created by the Bankruptcy Code, and, moreover, are expressly enumerated in section 157(b) as
core proceedings. *See* 28 USC §§ 157(b)(2)(A) - (O) ("Core proceedings include, but are not
limited to - ... (B) allowance or disallowance of claims against the estate or exemptions from
property of the estate . . .(E) orders to turn over property of the estate . . . (F) proceedings to
determine, avoid, or recover preferences . . . and (H) proceedings to determine, avoid, or recover
fraudulent conveyances..."). *See, e.g., All Star Int'l Trucks, Inc. v. Burlington Motor Carriers,
Inc. (In re Burlington Motor Holdings, Inc.)*, 2002 U.S. Dist. LEXIS 718 (D. Del. Jan. 17, 2002)
("avoidance actions are a creation of bankruptcy law and are within the matters enumerated in 28
U.S.C. § 157 as core proceedings").

16

law.  *See* JPMC Motion to Dismiss; Tr. June 24 Hearing.  Other than a footnote concerning the

asserted applicability of the FDI Act's jurisdictional bar (since rejected by the Bankruptcy

Court), JPMC's brief in support of its motion to dismiss does not cite to the FDI Act.  Moreover,

because the basis of JPMC's argument in support of dismissal was the purported existence of

legitimate disputes over ownership of the assets, JPMC raised every issue to the Bankruptcy

Court – both factual and legal – that it could muster.  In other words, JPMC's motion to dismiss

serves as a road map to this Court to assess what, if any, non-bankruptcy federal law issues may

arise.  Not one of the issues raised by JPMC implicated the FDI Act.  Rather, JPMC raised issues

of setoff and ownership interest (core competencies of the Bankruptcy Court), *see In re Sahni*,

227 B.R. 748, 751 (D. Kan. 1998), in addition to certain factual questions concerning whether

the Debtors' Deposits were held by WMB or WMB fsb.

　　　It is clear from even a cursory review of the record to date in the Adversary Proceedings

that resolution of these proceedings will not require meaningful consideration of the FDI Act or

any other non-Title 11 federal law.  Indeed, courts considering the same or similar federal

banking laws in analogous circumstances have held that mandatory withdrawal of the reference

is not merited.  *See, e.g., Sahni*, 227 B.R. at 751 (denying FDIC's motion to withdraw reference

based upon FDIC's right to recover fraudulent transfers under FDI Act provisions (analogous to

chapter 5 Bankruptcy Code avoidance actions) because bankruptcy court's resolution of case

would not require "substantial and material" consideration of FDI Act fraudulent conveyance

provision which granted FDIC a priority right, noting that priorities of various parties is

something a "bankruptcy judge is frequently required to decide"); *Hassett v. BancOhio Nat'l

Bank (In re CIS Corp.)*, 172 B.R. 748 (S.D.N.Y. 1994) (mandatory withdrawal inapplicable

because resolution of various debtor claims, including avoidance actions, will not require more

than a "straightforward application or routine interpretation" of the National Banking Act, the Competitive Equality Banking Act, and certain related regulations issued by the Comptroller of the Currency). JPMC's assertions of federal banking law implications should be reviewed with even greater scrutiny than in the aforementioned cases because JPMC has submitted itself to the equitable jurisdiction of the Bankruptcy Court through the commencement of the JPMC Adversary Proceeding and the filing of more than 40 proofs of claim. *See In re Best Prods. Co.*, 1994 U.S. Dist. LEXIS 5088 (S.D.N.Y. Apr. 19, 1994) (denying RTC's motion for mandatory withdrawal of case because the RTC had filed proofs of claim with the debtor's estate).

Other than the FDI Act's jurisdictional bar (which the Bankruptcy Court has already ruled inapplicable under controlling Third Circuit law, and consideration of which other district courts have found not to warrant withdrawal in any event),[18] JPMC relies upon mere conclusory statements, inapposite case law, and citations to tangentially-related statutes, policy statements, and handbooks to raise the specter of FDI Act implications.[19] As set forth more fully below, JPMC's arguments are red herrings, devoid of any substance identifying the purported conflict or the analysis the Bankruptcy Court will have to undertake.

---

[18] *See, e.g., Best Prods. Co.*, 1994 U.S. Dist. LEXIS 5088 (refusing to grant RTC's motion for mandatory withdrawal of case based upon the FDI Act's jurisdictional bar because the RTC, who asserted "a collision between the Bankruptcy Code and the FDI Act" had filed proofs of claim with the debtor's estate); *In re CIS Corp.*, 140 B.R. 351 (S.D.N.Y. 1992) ("To set a precedent providing for the withdrawal of bankruptcy proceedings to a district court whenever [jurisdictional] issue arises would work against the purposes of FIRREA itself, which was enacted 'to deal expeditiously' with the assets of failed depository institutions.").

[19] Beyond these inapplicable provisions, JPMC repeatedly suggests some vague "federal banking law" creates "issues that permeate the disputes among the parties." (*See, e.g.*, Motion at 23 n.11.) This nebulous contention cannot carry the Motion, however, given that the Supreme Court has expressly held that there is no federal common law supplementing the specific statutory provisions of the FDI Act. *See O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79 (1994). Accordingly, to the extent none of those specific statutory provisions apply here (which they do not for the reasons explained in the text), there simply is no other "federal banking law" that could be implicated in the Adversary Proceedings.

### 1. *Capital Contributions*

JPMC claims that the fact that the Debtors have asserted avoidance actions for the recovery of capital contributions against JPMC, pursuant to chapter 5 of the Bankruptcy Code somehow "is in fundamental conflict with Title 12's administrative and priority distribution scheme." (Motion at 19-20.)  First, courts have recognized that the FDI Act does not supersede the Bankruptcy Code's avoidance actions. *See In re First Republicbank Corp.*, 1990 Bankr. LEXIS 2840 (Bankr. N.D. Tex. June 19, 1990) ("Congress can, but has not provided that Section 548 of the Bankruptcy Code not apply to FDIC bank assistance packages given under Section 13(c) of the Federal Deposit Insurance Act.").  Second, JPMC does not (and cannot) explain, how the assertion of avoidance actions against JPMC as subsequent transferee implicates or "circumvents" section 1821(d)(11)(B) governing "[d]epositor preference" and/or "FIRREA's statutory regime."  Section 1821(d)(11)(B) of the FDI Act provides that the priority "waterfall" provided for in section 1821(d)(11)(A)[20] shall "supersede the law of any State [where] inconsistent."  That subsection provides that equity holders are to be paid last, after administrative expenses, depositors, and general creditors, from "*amounts realized from the liquidation or other resolution of any insured depository institution*" by the receiver.  In a strained effort to conjure up a conflict with the FDI Act, JPMC is apparently insinuating that if WMI's Counterclaims succeed in obtaining a judgment against it, simply because WMI is the

---

[20]    12 U.S.C. § 1821(d)(11)(A) provides: "Subject to section 1815 (e)(2)(C) of this title, amounts realized from the liquidation or other resolution of any insured depository institution by any receiver appointed for such institution shall be distributed to pay claims (other than secured claims to the extent of any such security) in the following order of priority: (i) Administrative expenses of the receiver. (ii) Any deposit liability of the institution. (iii) Any other general or senior liability of the institution (which is not a liability described in clause (iv) or (v)). (iv) Any obligation subordinated to depositors or general creditors (which is not an obligation described in clause (v)). (v) Any obligation to shareholders or members arising as a result of their status as shareholders or members (including any depository institution holding company or any shareholder or creditor of such company)."

shareholder of WMB, any recovery would be in violation of the FDI Act's depositor preference scheme. This position is impossible to reconcile with the statute, the case law cited by JPMC, or the facts at bar, and therefore, there is no conflict with the FDI Act.

First, as recognized by the Bankruptcy Court, the Counterclaims being asserted in the Adversary Proceedings are against JPMC, not the FDIC. (Tr. 6/24/09 at 93, "I do not find FIRREA is a jurisdictional bar to the debtors' claims to property that is no longer in the hands of the FDIC as receiver, but are in the hands of JPMC. I think that's clear from the Third Circuit law, which is binding on this Court.")[21] Thus, any recoveries on account of the Counterclaims would not be "realized from the liquidation or other resolution of any insured depository institution" and would plainly not implicate the FDI Act's depositor preference.[22]

Second, the two cases cited by JPMC are plainly inapposite. Both cases concern "takings" claims asserted against the United States government.[23] In the Adversary Proceedings, the Debtors have not sought "compensation" for the seizure of WMB. Rather, they are asserting

---

[21] As further evidence, in *Rosa v. R.T.C.*, 938 F.2d 383 (3d Cir. 1991), the Court of Appeals for the Third Circuit considered the merits of a claim for monetary damages asserted against a successor bank. *Id.* at 397-400. While the court reversed the injunction ordering such claims paid (solely because the successor bank was in conservatorship), it raised no issue as to whether recovery by the (non-depositor) plaintiffs would threaten to circumvent Title 12's depositor preference doctrine. The plaintiffs in *Rosa* were not bank shareholders, and perhaps bank creditors, however, they would have been junior to those owed deposit liabilities and, under JPMC's theory, their recovery would have been in conflict with the FDI Act. *See* 12 U.S.C. §1821(d)(11)(A).

[22] Even if the Counterclaims were being asserted against the FDIC in the Adversary Proceedings – which they are not – JPMC cites no bar (under the FDI Act or otherwise) against parent companies asserting claims against their failed financial institution subsidiaries and recovering on account of such claims. In this instance, the parent company would not recover on account of an "obligation arising as a result of their status as shareholders or members," *see* 12 U.S.C. §1821(d)(11)(A), and, just as in bankruptcy (absent subordination), there would be no violation of absolute priority.

[23] In *Branch v. United States*, 69 F.3d 1571 (Fed. Cir. 1995), the court held that the FDIC's seizure of the plaintiff trustee's bank as a result of FIRREA's cross-guarantee provision did not constitute an uncompensated taking in violation of the U.S. Constitution. *Id.* at 1583; *California Housing Secur., Inc. v. United States*, 959 F.2d 955 (Fed. Cir. 1992) (same); *Golden Pac. Bancorp v. United States*, 15 F.3d 1066 (Fed. Cir. 1994) (same).

claims for constructive fraudulent transfer against JPMC as subsequent transferee, as provided to

the Debtors under the Bankruptcy Code and state law as transferors of property to, or creditors

of, WMB.  Given the obvious distinction, any FDI Act implications discussed in those cases

would not be considered by the Bankruptcy Court in resolving the Counterclaims asserted

against JPMC.  Thus, JPMC's assertion that the Debtors' Counterclaims seek to circumvent the

depositor preference provision is totally unfounded.  In fact, resolution of the Counterclaims will

not require the Bankruptcy Court to interpret, apply, or even consider the FDI Act's depositor

preference provision.

Moreover, even if the Counterclaims did implicate the FDI Act's depositor preference in

a material and substantial manner, the Bankruptcy Court is uniquely-suited to apply such law.

After all, a bankruptcy court is well skilled at interpreting and applying priority schemes of

distribution – a function it performs regularly.  *See*, *e.g.*, 11 U.S.C. §§ 507, 1129.

JPMC's next "reach" for FDI Act implications is nothing less than frivolous.  JPMC

asserts that WMI's Counterclaims "raise specific issues regarding the federal regulatory scheme

that governs the treatment of regulatory capital."  (Motion at 21.)  As the lone "example" of this

purported implication, JPMC cites section 1828(u) of Title 12 (section 18(u) of the FDI Act).

However, JPMC is only able to make this assertion by blatantly mischaracterizing the terms of

the cited provision.  As excerpted by JPMC, section 1828(u)(1) prohibits:

> [C]laims[s] against any Federal banking agency (including in its
> capacity as conservator or receiver) for the return of assets of an
> affiliate or controlling shareholder of the insured depository
> institution transferred to, or for the benefit of, an insured
> depository institution by such affiliate or controlling shareholder of
> the insured depository institution, or a claim against such Federal
> banking agency for monetary damages or other legal or equitable
> relief in connection with such transfer, if at the time of the transfer
> . . . .  (Motion at 21.)

However, the very next passage – a passage that JPMC avoids quoting through the strategic placement of an ellipses – provides that this bar applies only if, "at the time of the transfer (A) the insured depository institution is subject *to any direction issued in writing by a Federal banking agency to increase its capital* . . ." 12 U.S.C. § 1828(u) (emphasis added). JPMC offers nothing to indicate that WMB was operating under any such direction (which it was not), choosing instead to ignore this requirement simply by omitting the pertinent, operative statutory language from its brief.  Without this convenient omission, it is clear that section 1828(u), by its express terms, is inapplicable to the Counterclaims and that JPMC's reference to "Section 1828(u)'s bar" is of no substance and must therefore be discarded.

Section 1828(u) also does not apply for the additional reason that it expressly applies only to "claim[s] against any Federal banking agency . . . ." 12 U.S.C. § 1828(u).  As discussed, Debtors' Counterclaims are not against the FDIC.  Rather, they are against JPMC, a transferee of assets of an insured depository institution.

### 2.   *Adjudication of Ownership of Disputed Assets Will Not Require Substantial and Material Consideration of Federal Banking Laws*

JPMC claims that "[b]anking law issues permeate the disputes concerning WMI's assertion that it is entitled to certain assets arising out of or utilized in connection with the banking operations of WMB" such that the "reference must be withdrawn given the nature of the counterclaims asserted." (Motion at 21.)  Specifically, JPMC refers to the right to Tax Refunds, the Deposits, the Trust Securities, and certain Intellectual Property claims.  The Debtors address each in turn below, but as a threshold matter, with respect to the Tax Refunds, the Trust Securities, and the Deposits, it must be remembered that it was JPMC itself that filed the JPMC Adversary Proceeding, which specifically invoked the Bankruptcy Court's jurisdiction to adjudicate these very issues.  (JPMC Adversary Complaint at Counts 1-8.)  While JPMC may be

dissatisfied with the Bankruptcy Court's rulings to date, this dissatisfaction is no basis for sweeping under the rug JPMC's very own admissions that these issues are properly before the Bankruptcy Court. And, it is even more disingenuous for JPMC to now suggest that it was the Debtors' Counterclaims, rather than JPMC's affirmative claims, that cause it to seek withdrawal of the reference when JPMC does not limit its argument asserted in the Motion to the Counterclaims. (Motion at 23).

Further, with respect to all of the asset ownership disputes, JPMC fails to identify any potential conflict between provisions of Title 11 and the identified statutes and regulations it sprinkles in its Motion. In *Hassett v. BancOhio Nat'l Bank (In re CIS Corp.)*, 172 B.R. 748 (S.D.N.Y. 1994), a bankruptcy trustee asserted, among other things, declaratory judgment and turnover actions concerning various assets against a banking entity defendant that pointed to banking statutes and regulations as grounds for withdrawal of the reference. The district court found that the existence of interplay between Title 11 and banking statutes is both commonplace and insufficient; "unless it desires evisceration of Title 11, [movant-bank] can hardly suggest that this Court is required to withdraw the reference in order to scrutinize whether there *might* be a conflict between the federal law and Title 11 when it has not identified the substance of conflict." *Id.* at 754. For the same reasons, as discussed in more detail below, JPMC's Motion provides insufficient grounds to warrant withdrawal of the reference.

(a)    Debtors' Deposit Accounts

Turnover of the Debtors' Deposits are a core proceeding specifically provided for in the Bankruptcy Code. *See* 28 U.S.C. § 157(b)(2)(E) ("orders to turn over property of the estate"); 11 U.S.C. § 542(b) ("an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee . . . ."). Although JPMC now claims resolution of the Turnover Action will implicate issues of

23

federal banking law, it does not support this assertion with a showing that the Bankruptcy Court
will be required to "meaningfully consider" any banking laws, let alone banking laws of "first
impression" or that "sharply conflict" with Title 11.

First, JPMC claims that the factual circumstances surrounding the pre-petition transfer of
the Debtors' Deposits from WMB to WMB fsb "raises material issues under the banking laws."
(Motion at 27.)  Significantly, however, JPMC raised none of these purported issues in its motion
to dismiss the Turnover Action, its reply to the Debtors' opposition, or at oral argument at the
June 24 Hearing (even though this Motion was filed prior to the hearing).  Now, in support of the
Motion, JPMC cites to Sections 23A and 23B of the Federal Reserve Act which primarily govern
credit extended by a bank to its an affiliate.  However, the Deposits represent credit extended by
the Debtor (the depositor) to its subsidiary banks, WMB or WMB fsb, not the other way
around.[24]  Thus, JPMC raises another red herring.

To the extent JPMC asserts that an intercompany loan made from WMB fsb to WMB
*subsequent* to the transfer of Deposits implicates banking law, it also misses the point – whether
the loan between WMB fsb and WMB was in violation of the statute is irrelevant to the Debtors'
Turnover Action and to whether the Deposit liabilities were transferred to, and assumed by,
WMB fsb.  This is because the Deposits held at *both banks* were assumed by JPMC and the

---

[24]    The Board of Governors of the Federal Reserve System summarize Sections 23A and 23B of the
Federal Reserve Act as follows:  "Sections 23A and 23B and Regulation W limit the risks to a
bank from transactions between the bank and its affiliates and limit the ability of a bank to
transfer to its affiliates the subsidy arising from the bank's access to the Federal safety net (i.e.,
lower cost insured deposits, the payment system, and the discount window).  The statute and rule
accomplish these purposes by imposing quantitative and qualitative limits on the ability of a bank
*to extend credit to*, or engage in certain other transactions with, an affiliate."  *See*
http://www.federalreserve.gov/boarddocs/SRLETTERS/2003/sr0302.htm#Footref (emphasis
added); *see also* 12 U.S.C. § 371c(b)(7) (defining a "covered transaction" to include "a loan or
extension of credit to the affiliate", certain purchases of assets or securities from an affiliate,
accepting the securities of an affiliate as collateral and "the issuance of a guarantee, acceptance,
or letter of credit, including an endorsement or standby letter of credit, on behalf of an affiliate").

Bankruptcy Court will not have to afford meaningful consideration to these inapplicable – and largely irrelevant – banking statutes. Thus, even if the prepetition transfer was unwound, the outcome would be the same – JPMC is liable for the Debtors' Deposits. In any event, JPMC fails to carry its burden of showing that anything more than straightforward application or routine interpretation of federal banking law will be necessary to adjudicate the Debtors' claims to their Deposits.

Second, JPMC raises the specter of whether the "credits" in the Deposit accounts represent liabilities owed the Debtors (which the Debtors have clearly shown to be the case in their summary judgment motion), or "capital" or other amounts that do not belong to the Debtors because they were sold to JPMC pursuant to the P&A Agreement. (Motion at 28.) Putting aside its lack of merit, what JPMC's assertion boils down to is that the Bankruptcy Court will need to interpret banking law in order to determine if the Deposits transferred to JPMC under the P&A Agreement represented debt or equity of WMB. In *BancOhio*, the district court was faced with an analogous situation. There the movant-defendant bank and the trustee-plaintiff were engaged in a dispute over certain transactions and whether, pursuant to such transactions, assets should be properly deemed sold or simply pledged to the bank. *BancOhio*, 172 B.R. at 752. The bankruptcy trustee argued that the National Bank Act, the Competitive Equality Banking Act, and certain related regulations issued by the Comptroller of the Currency all mandated that the transaction be found to be a loan and not a sale. *Id.* at 753. The defendant bank applied to the district court to withdraw the reference, claiming that the trustee's claims (as JPMC claims with respect to the Adversary Proceedings) "infuse the case with issues which will require the bankruptcy court to substantially interpret these [banking] statutes and regulations . . . [and] that the court will be required to examine the purpose underlying the laws and regulations and the

25

interplay of the statutes and regulations with various provisions of Title 11." *Id.* The district court found that resolution of the trustee's claims would not require any more than "straightforward application" or "routine interpretation" of the various banking laws raised by the trustee. *Id.* In so finding, the court rejected the movant-bank's "sweeping conclusion that significant interpretation of the statutes and regulations and their underlying policy considerations is compelled," finding that the bank failed to "explain why that must be so or offer the slightest support for its conclusion." *Id.* The district court's description is squarely applicable to JPMC's Motion.

Further, such debt versus equity determinations are within the Bankruptcy Court's bailiwick as it is required to make such determinations in almost every chapter 11 case. *See U.S. v. State Street Bank and Trust Co.*, 303 B.R. 35, 38 (Bankr. D. Del. 2003) (proceeding to factual determination if debtor-creditor relationship exists or corporation-shareholder relationship exists); *Moglia v. Quantum Industrial Partners, LDC (In re Outboard Marine Corp.)*, 2003 WL 21697357 (N.D. Ill. July 21, 2003) (reaffirms the broad expanse of a bankruptcy court's powers to inquire into the substance of a creditor's claim to determine whether it should be allowed on a par with other legitimate debts or treated as equity interests); *see also* 11 U.S.C. §501 (providing for the filing of claims and interests). Again, JPMC fails to explain how the Bankruptcy Court will be faced with "meaningful consideration" of federal banking laws and therefore fails to carry its burden.

Finally, JPMC's claims that the FDIC has "reserved its right to require that accounts such as these be turned over to the receivership estate pursuant to Section 9.5 of the P&A Agreement" should be afforded no weight by this Court. First, as discussed below, the lion's share of the Deposits (*i.e.*, more than $3.7 billion out of $4 billion) was not in receivership and thus was not

transferred under the P&A Agreement.  Thus, any rights the FDIC may have under Section 9.5 are inapplicable and therefore irrelevant to substantially all of the Debtors' Deposits.  Second, it is undisputed that with respect to the remainder of the Deposits, the FDIC has not purported to exercise such rights in the more than nine months since the time of the P&A Transaction and the Debtors' Petition Date.  *See* Tr. June 24 Hearing at 44 (FDIC Counsel: "We have not asserted that 9.5 right.  Because we do not want to interfere with the administration of this bankruptcy case.").  JPMC cannot carry its burden of persuasion based upon a contingent implication of a contractual provision that, even if invoked, would raise a matter of contract, not bank regulatory law.  *See Matter of Vicars Ins. Agency, Inc.*, 96 F.3d 949, 954 (7th Cir. 1996) ("Motions to withdraw the reference cannot rest on speculative and completely hypothetical contentions that federal claims might involve novel issues.") (quotations omitted); *Continental Airlines*, 138 B.R. at 447 (refusing to grant motion to withdraw reference based on "speculation about [non-Title 11 federal law] which may or may not arise . . . [because] would be inconsistent with the purposes underlying the very existence of the Bankruptcy Court and would encourage forum shopping in a manner Congress disdained when it sought to avoid").  Notably, even if the FDIC were to invoke such rights, rather than being faced with a federal banking law issue, JPMC would be required to present to the Bankruptcy Court a motion seeking relief from bankruptcy's automatic stay.  *See Gross v. Bell Savings Bank PA SA*, 974 F.2d 403 (3d Cir. 1992) (noting that injunctive relief, such as bankruptcy's automatic stay, "is appropriate [with respect to the FDIC] where that remedy is imposed by statute, automatically and by operation of law, without any action by a court.")

(b)     Tax Refunds

The case law teaches that a bankruptcy court "is indeed an appropriate forum in which to determine the competing rights of parties in a tax refund resulting from a consolidated return,

27

where one of the parties is a debtor in bankruptcy." *In re Fairchild Aircraft Corp.*, 126 B.R. 717, 720 (Bankr. W.D. Tex. 1991). The reason for this rule is obvious: to issue a ruling with respect to the Tax Refunds, the Bankruptcy Court will not need to engage in substantial and material consideration of federal banking law. A review of a directly on-point decision, concerning the exact same issues as between the Debtor and JPMC is perhaps the best evidence that any application of non-bankruptcy federal law will be, at best, a "simple application" of such law, insufficient to warrant withdrawal.

In *United States v. MCorp Fin. (In re MCorp Fin)*, 170 B.R. 899 (S.D. Tex. 1994), just as here, a chapter 11 debtor parent company filed consolidated tax returns for itself and its subsidiaries, including certain banking subsidiaries seized by the FDIC. *Id.* at 899. Also, just as is the case with WMI, the debtor had received some of the anticipated tax refund, but claimed significantly more from the IRS. *Id.* at 900. Just as with WMI, the debtor sought the tax refunds so that it could fund an initial plan distribution. *Id.* Bank One (here, JPMC),[25] the banking entity that had purchased the debtor's banking subsidiary's assets and assumed its liabilities filed a claim in the debtor's bankruptcy case for the tax refund. *Id.* Bank One claimed that the refund money "was never and never should have been considered property of the [debtors'] estates." *Id.* The court analyzed the tax allocation agreement[26] between the debtor and its subsidiary bank as well as the purchase agreement between Bank One and the FDIC. *Id.* at 901-03. Ultimately, the court determined that the tax allocation agreement created "a debtor-creditor relation, which is the quintessential business of bankruptcy." *Id.* at 902. The court rejected Bank One's claim that the tax refunds were held in trust for its benefit, finding that "the equities of unjust enrichment do

---

[25]    Incidentally, Bank One was previously subsumed into JPMC via reverse merger.

[26]    WMI and WMB are party to a similar tax sharing agreement.

not appear between a post-bankruptcy purchaser out of a receivership and the creditors of the estate." *Id.* at 902. The closest federal banking issue the court had to consider was a review of the "standard" purchase and assumption agreement used by the FDIC in order to determine if Bank One had purchased the right to tax refunds (the court found that it had not). *Id.* at 902-03. The opinion contains no cites to the FDI Act. Thus, it is clear that for the Bankruptcy Court to resolve the issue of the Tax Refunds, it will not be faced with "meaningful consideration" of the federal banking laws. Moreover, in light of *MCorp*, JPMC cannot seriously contest that the Bankruptcy Court will have to consider an issue that may be characterized as one of "first impression" or "sharply in conflict" with the Bankruptcy Code. *See In re Continental Airlines*, 138 B.R. 442.[27]

In support of the proposition that payments from a tax group filing parent company should be no less favorable to the subsidiary that if the banking subsidiary had filed separately, JPMC cites to a policy statement and a handbook: the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure and the OTS's Holding Companies Handbook. (Motion at 24-5). Both "authorities" contemplate going concern situations as between holding companies and their bank subsidiaries, distinct from the circumstances at bar. First, as between WMI and JPMC, a parent company and the purchaser of its subsidiary bank's assets, such "law" is simply inapplicable. Second, as discussed in *MCorp,* any equitable basis by which JPMC could possibly assert a trust or priority claim to the Tax Refunds will not trump bankruptcy's

---

[27] In sharp contrast, both cases cited by JPMC in which the court withdrew the reference concerned issues of first impression. *See United States v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 295 B.R. 222, 223 (D.N.J. 2003) (finding that resolution of case required "interpretation of first impression because neither party, nor the Court could find any case law directly interpreting 26 U.S.C. § 707(a)(2)(B)"); *In re CM Holdings, Inc.* 221 B.R. 715 (D.Del. 1998) (determination required adjudication of two "unsettled tax issues of first impression which require substantial and material consideration of the federal tax law.").

fundamental principal of equal treatment of creditors. Thus, the Bankruptcy Court will not need to meaningfully consider such issues.

Furthermore, assuming, *arguendo*, that the federal banking law raised by JPMC requires consideration that certain Tax Refund assets be held in trust for the benefit of WMB or its assignee, bankruptcy courts are very experienced with claimants seeking to avoid the debtor-creditor classification, asserting arguments that property is held in trust for their benefit. *See In re Flanagan*, 503 F.3d 171, 180-81(2d Cir. 2007) ("The effect of a constructive trust in bankruptcy is profound. While the bankruptcy estate is defined very broadly under § 541(a)(1) of the Bankruptcy Code to include all legal or equitable interests of the debtor, any property that the debtor holds in constructive trust for another is excluded from the estate pursuant to § 541 (d)"); *Stanziale v. Rite Way Meat Packers, Inc. (In re CFP Liquidating Estate)*, 2009 Bankr. LEXIS 1536 (Bankr. D. Del. May 21, 2009) ("In the context of bankruptcy, if a trust exists, 11 U.S.C. § 541(d) excludes those assets in the trust from a debtor's estate"); *Asurion Ins. Servs. v. Amp'd Mobile, Inc. (In re Amp'd Mobile, Inc.)*, 377 B.R. 478, 490 (Bankr. D. Del. 2007) (rejecting creditor request for imposition of a constructive trust); *EBS Pension, L.L.C. v. Edison Bros. Stores, Inc. (In re Edison Bros., Inc.)*, 268 B.R. 409 (Bankr. D. Del. 2001) (Walrath, J.) (same).[28] Moreover, to the extent the issue of the Debtors' tax sharing agreement with WMB becomes relevant to adjudication of the Tax Refunds, the Bankruptcy Court is uniquely skilled in

---

[28]    Further, bankruptcy courts have frequently adjudicated issues of competing claims among members of a consolidated tax groups. *See, e.g., Oakridge Consulting, Inc. v. United States (In re Consol. FGH Liquidating Trust)*, 325 B.R. 564, 568 (Bankr. S.D. Miss. 2005) (interpreting Treas. Reg. 1.1502-77(a), holding that the former parent corporation was the only agent authorized to act in matters relating to the tax liability for the consolidated return years); *Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.)*, 269 B.R. 481, 502 (Bankr. E.D.N.Y. 2001) (interpreting tax sharing agreement to allocate tax refunds among consolidated tax group finding no basis for constructive trust); *Nisselson v. Drew Indus. (In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 423 (Bankr. S.D.N.Y. 1998) (discussing affiliated tax group filing and allocation of NOLs).

assessing the impact of executory contracts. *See* 11 U.S.C. §365 (concerning the assumption, assignment, and rejection of executory contacts and unexpired leases). Thus, the Tax Refunds do not warrant withdrawal of the reference, because the Bankruptcy Court will not be required to engage in anything more than a familiar, straightforward application of law, far from engaging in a complex interpretation of non-Title 11 federal law.

(c)     Trust Securities

In its Motion, JPMC allocates three sentences to certain Trust Securities (the "Trust Securities"), issued between March 2006 and October 2007, by certain special purpose entities associated with WMI and its then subsidiaries. JPMC and the Debtors both assert ownership interests in the Trust Securities. Because the Trust Securities were treated by WMB as core capital for regulatory capital purposes, JPMC claims that the Bankruptcy Court will be called on to "consider the effect of the OTS's capital adequacy regulations and the standards imposed under 12 U.S.C. § 1464(s), (t)." JPMC's conclusory, unsupported statement constitutes insufficient grounds to require withdrawal of the reference.

First, the Debtors have asserted Counterclaims to recover the Trust Securities, or the value of the Trust Securities, from JPMC as transferee of preferential or constructively fraudulent transfers – *i.e.*, core bankruptcy avoidance actions. With respect to the preference Counterclaim, brought pursuant to section 547 of the Bankruptcy Code, the Bankruptcy Court will be required to determine, among other things, if any transfer of the Trust Securities to WMB was made in satisfaction of an "antecedent debt owed by the debtor before such transfer was made." *See* 11 U.S.C. § 547. With respect to the fraudulent transfer Counterclaim, brought pursuant to section 548 of the Bankruptcy Code, the Bankruptcy Court will be required to determine, among other things, if any transfer of the Trust Securities to WMB was made in exchange for "reasonably equivalent value." *See* 11 U.S.C. § 548. These are determinations that

31

are commonplace for the Bankruptcy Court and fall easily within its expertise. *See OHC Liquidation Trust v. Am. Bankers Ins. Co. (In re Oakwood Homes Corp.)*, 2005 Bankr. LEXIS 429 (Bankr. D. Del. Mar. 18, 2005) ("a preference action under § 547 is clearly a core proceeding . . . as are fraudulent conveyance actions under §§ 544(b) and 548 . . . " and because the avoidance actions "are creatures of [Bankruptcy Code] statute").

Sections 1464(s) and (t), provisions of the Home Owners' Loan Act[29] concerning "Minimum capital requirements" and "Capital Standards" of savings associations, will not significantly impact the Bankruptcy Court's resolution of the Debtors' Counterclaims. The fact that Congress may have granted the OTS power to issue regulations and make determinations concerning the operations of savings institutions and to require savings associations to achieve and maintain adequate capital only paints the background picture as to what may have given rise to a purported obligation on the part of WMI to contribute the Trust Securities to WMB. As with all preference and fraudulent transfer claims, such an obligation would only be relevant to the Debtors' Counterclaims in determining if any purported transfer of the securities was made in satisfaction of an antecedent obligation, a necessary element of any preference avoidance action, or if not, was made for less than reasonably equivalent value, an element of the Debtors' constructive fraudulent transfer claim. Either way, the Bankruptcy Court is more than able to determine what constitutes an "antecedent debt" or whether satisfaction of any such debt yields "reasonably equivalent value." *See Argus Mgmt. Group v. Gab Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 215 (Bankr. D. Del. 2005) (reserving the issue for trial as to whether debtor's transfers were on account of antecedent debt); *Pardo v. Gonzaba (In re APF Co.)*, 308 B.R. 183, 187 (Bankr. D. Del. 2004) (addressing constructively fraudulent transfers and finding transfers in

---

[29]    The Home Owners' Loan Act is the statute under which WMB was chartered.

satisfaction of antecedent debt were made for value). In neither instance will the Bankruptcy Court be required to meaningfully consider the FDI Act provisions cited to in the Motion, and JPMC fails to explain otherwise, because it cannot. Furthermore, JPMC, who effectively asserts only the mere existence of such provisions, does not allege that they conflict with application of the Bankruptcy Code. Merely citing statutory provisions is insufficient to warrant withdrawal of core bankruptcy avoidance actions.[30]

        (d)    IP Claims

With respect to the IP Counterclaims, in which the Debtors assert that JPMC has infringed upon certain WMI intellectual property assets, JPMC insufficiently asserts that the resolution of the Debtors IP Counterclaims will require "substantial and material" consideration of banking laws. JPMC states that "banking laws make clear . . . that the FDIC is expressly authorized to 'transfer any asset or liability of the institution in default . . . without any approval, assignment, or consent with respect to such transfer.'" (Motion at 26 *citing* 12 U.S.C. § 1821(d)(2)(G)(II).) Notwithstanding JPMC's sweeping statement, at best it is only tangentially relevant whether or not the FDIC had the authority to transfer intellectual property licenses. Rather, the issue before the Bankruptcy Court will be whether the licenses terminated and thus were not an "asset of the institution in default" and whether the intellectual property licenses or underlying trade marks at issue were property of the Debtors' estate upon the closure of WMB. The Bankruptcy Court is more than able to make such a determination. *See Krebs Chrysler-Plymouth v. Valley Motors, Inc.*, 141 F.3d 490 (3d Cir. 1998) ("Trademarks are property, and

---

[30]    Furthermore, to the extent the Bankruptcy Court is required to evaluate the nature of any commitment on the part of WMI to contribute the Trust Securities to WMB, it will more likely be required to consider section 365(o) of the Bankruptcy Code. *See* 11 U.S.C. § 365(o) (concerning a "commitment by the debtor to a Federal depository institutions regulatory agency"). The Bankruptcy Court is clearly the right court to make such a determination given that it will be applying and considering a Bankruptcy Code provision and the standards developed thereunder.

franchises are licenses to use such property.  Thus, under [state] law, these franchises are interest

in property, and as such are property of the estate under section 541 [of the Bankruptcy Code].");

*Continental Airlines*, 138 B.R. at 445 ("The determination of what constitutes property of the

bankruptcy estate is inherently an issue to be determined by the bankruptcy court.").  As the

*Continental* court found, without a "persuasive showing" that the Bankruptcy Court will need to

consider federal banking laws to determine whether such licenses are property of the estate, the

court "cannot conclude that the Bankruptcy Court is stepping into the realms of difficult federal

law outside of the Bankruptcy Code in determining the property of the estate." *Id.* at 445.  JPMC

has clearly not carried its burden of persuasion with respect to the IP Counterclaims in that it has

not presented a need for the Bankruptcy Court to "substantially and materially" consider federal

banking law in connection therewith.

### C.    The Bankruptcy Court Has Already Considered, and Ruled Inapplicable, the FDI Act's Jurisdictional Bar

JPMC's argument that withdrawal of the reference is mandated because the Bankruptcy

Court will have to consider the FDI Act's jurisdictional bar (12 U.S.C. § 1821(d)(13)(D)) is

foreclosed by the Bankruptcy Court's ruling at the June 24 Hearing.  In its ruling denying the

FDIC's and JPMC's motions to stay the Adversary Proceedings, the Bankruptcy Court

unequivocally held that the jurisdictional bar set forth in section 1821(d)(13)(D) does not apply

to Debtors' Counterclaims against JPMC.  The Court explained its holding:

> I do not find FIRREA is a jurisdictional bar to the Debtors' claims
> to property that is no longer in the hands of the FDIC as receiver,
> but [is] in the hands of JPMC.  I think that's clear from the Third
> Circuit precedent, which is binding on this Court.  *Hudson* made
> clear that FIRREA only bars claims against a receiver or an
> institution in receivership.

(Tr. 6/24/09 at 93.)  Thus, the "substantial issue as to whether FIRREA's jurisdictional limitations prevent WMI from asserting the counterclaims" raised by JPMC (Motion at 32) has already been resolved, and it, by definition, cannot constitute grounds to withdraw the reference.

Any attempt by JPMC to re-argue the issue before this Court would violate the law of the case doctrine and constitute an improper collateral attack on the Bankruptcy Court's ruling.  The law of the case doctrine "limits relitigation of an issue once it has been decided" in an earlier stage of the same litigation.  *In re Continental Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir. 2002); *see Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994) ("The law of the case doctrine limits the extent to which an issue will be reconsidered once the court has made a ruling on it."). As the Third Circuit has emphasized, the law of the case doctrine promotes finality, consistency, and judicial economy.  *In re City of Philadelphia Litig.*, 158 F.3d 711, 717-18 (3d Cir. 1998).  In light of these considerations, courts "should be loathe" to revisit issues that have already been decided "in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'"  *Lambert v. Blackwell*, 387 F.3d 210, 237 (3d Cir. 2004) (quoting *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 817 (1988)).  Similarly, a "collateral attack" is a "tactic whereby a party seeks to circumvent an earlier ruling of one court by filing a subsequent action in another court." *Pratt v. Ventas, Inc.*, 365 F.3d 514, 519 (6th Cir. 2004).  The long-standing bar on using this tactic stems from the need for federal court orders to carry the full force of law unless and until they are reversed on appeal. *See, e.g., AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.)*, 117 B.R. 789, 797 (Bankr. S.D.N.Y. 1990) ("The rationale underlying the bar against collateral attack is twofold: (1) that there be finality to matters administered by the judicial system; and (2) that the integrity of the appellate procedure is not circumvented.").  In *Celotex Corp. v. Edwards*, 514 U.S. 300

(1995), the Supreme Court strongly rebuked a party's attempt to collaterally attack a bankruptcy court order in a different federal court, noting that if the parties were "dissatisfied with the Bankruptcy Court's ultimate decision," then they should follow the appellate procedures in 28 U.S.C. § 158. *See id.* at 313. The parties' choice "not to pursue this course of action, but instead to collaterally attack the Bankruptcy Court's [order]" threatened to "seriously undercut[] the orderly process of the law." *Id.* Simply put, JPMC cannot get two bites at the section 1821(d)(13)(D) apple.

Therefore, JPMC is precluded from invoking the same jurisdictional provision that it invoked previously, and that the Bankruptcy Court found inapplicable, as a basis for the Court to withdraw the reference.[31]

## II.    PERMISSIVE WITHDRAWAL IS NOT WARRANTED

In the alternative, JPMC argues that permissive withdrawal of the reference is appropriate based upon the assumptions that (i) the Court will transfer these proceedings to the District Court for the District of Columbia; (ii) the District Court for the District of Columbia will consolidate these proceedings with the DC Action; and (iii) transferring the proceedings from the better-equipped and faster-paced Bankruptcy Court "is efficient and desirable." (Motion at 35-36.)

First, JPMC's assumption that the Adversary Proceedings will be transferred has already been foreclosed by the Bankruptcy Court. Specifically, as discussed above, JPMC has already argued (unsuccessfully) in its papers and at the June 24 Hearing that the Adversary Proceedings should be transferred to the District Court for the District of Columbia. For centuries it has been

---

[31]    All the cases relied upon by JPMC are therefore inapposite because in each of those cases, the Court had not yet considered, let alone reviewed briefing and issued a ruling on, the FDI Act jurisdictional bar issue. In contrast, here JPMC deliberately chose to fight that battle first and then move to withdraw the reference after fully briefing its motion to stay and motion to dismiss the Turnover Action and partially briefing its motion to dismiss the Debtors' Counterclaims.

"[a] fundamental precept of common-law adjudication . . . that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction cannot be disputed in a subsequent suit between the same parties or their privies.'" *Montana v. United States*, 440 U.S. 147, 153 (1979) (quoting *Southern Pac. Ry. Co. v. United States*, 168 U.S. 1, 48-49 (1897); alteration omitted). Given the Bankruptcy Court's rejection of JPMC's motion to transfer or stay the Adversary Proceedings, JPMC is now barred from seeking transfer of the Adversary Proceedings by the doctrine of issue preclusion. Therefore, its arguments concerning efficiency in connection with permissive withdrawal of the reference rest upon an invalid basis.

Second, even assuming, *arguendo*, that JPMC could succeed in having the Adversary Proceedings transferred and consolidated with the DC Action, JPMC fails to overcome the presumption in favor of the Bankruptcy Court retaining jurisdiction over these core proceedings. As the moving party, JPMC carries the burden of demonstrating "cause" sufficient to overcome "presumption that Congress intended to have bankruptcy proceedings adjudicated in bankruptcy court, unless rebutted by contravening policy." *In re Oakwood Homes Corp.*, Civil Action No. 06-436-JJF, 2007 WL 2071730, at *2 (D. Del. July 17, 2007) (internal quotation omitted); *In re IT Group, Inc.*, No. 02-10118 MFW, 2007 WL 211179, at *1 (D.Del. Jan. 26, 2007). The Third Circuit has set forth five factors that a district court should consider in determining whether "cause" exists for discretionary withdrawal: (1) promoting uniformity of bankruptcy administration; (2) reducing forum shopping and confusion; (3) fostering economical use of debtor/creditor resources; (4) expediting the bankruptcy process and (5) timing of the request for withdrawal. *In re Pruitt*, 910 F.2d at 1168.

Before assessing these factors, however, the Court "should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity

will turn". *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2nd Cir. 1993), cert. dismissed, 511

U.S. 1026, 114 S.Ct. 1418. *See also In re Davis*, Bankr. No. 06-11746, Adversary No. 06-287,

2006 WL 3392167, at *2 (E.D.Pa. Nov. 20, 2006) ("in determining whether cause is shown,

courts generally begin by considering the threshold question of whether the matters to be

withdrawn are 'core' or 'non-core' to the bankruptcy case"); *In re Westmoreland Coal Co.*, 221

B.R. 512, 514-5 (D. Colo. 1998) ("the principle inquiry is whether the claim involves core or

noncore bankruptcy proceeding"). Thus, where the matters are core proceedings, many of the

*Pruitt* factors will weigh in favor of the Bankruptcy Court resolving the case.

In this case, the consideration of whether the proceedings are core or non-core and the

abovementioned *Pruitt* factors overwhelmingly support the denial of the Motion.

### A.    The Core Nature of the Adversary Proceedings and Related *Pruitt* Factors Militate Against Withdrawal

Significantly, JPMC "does not object to the characterization of the Adversary

Proceedings as core proceedings under 28 U.S.C. § 157(b)" for purposes of its motion.  (Motion

at 37).  Indeed, JPMC consents to this characterization because, as discussed above, the Turnover

Action, the myriad avoidance actions, the actions to determine property of the estate, the

disallowance of bankruptcy claims, among other claims, are all expressly statutorily-deemed

core proceedings. *See* 28 U.S.C. § 157(b).  The Bankruptcy Court is best equipped to handle

such core proceedings, which lie at the heart of the Bankruptcy Court's exclusive jurisdiction and

unique expertise, so as to "foster efficient use of judicial resources, promote uniformity in

bankruptcy administration, and avoid confusion." *In re IT Group, Inc.*, 2007 WL 211179, at *2;

*see also In re Am. Classic Voyages Co.*, 337 B.R. 509, 512 (D.Del. 2006) ("because it is a core

proceeding with which the Bankruptcy Court is already familiar, the continued handling of the

matter by the Bankruptcy Court would foster efficient use of judicial resources, promote

uniformity in bankruptcy administration, and avoid confusion"); *In re Winstar Communications, Inc.*, Civ.A.04-928-JJF, 2004 WL 2713101, at *4 (D.Del. Nov. 16, 2004) (maintaining bankruptcy-related claims affecting distribution to creditors in the bankruptcy court "will diminish the risk of forum shopping and will lessen confusion by fostering consistent administration of the estate").

The Adversary Proceedings – including the Turnover Action in which Debtors seek to recover approximately $4 billion in deposits – not only are "core" proceedings, but also are essential to the administration of the Debtors' estates and integral to the chapter 11 restructuring of debtor-creditor rights, thus going to the very foundation of federal bankruptcy power. *See, e.g., Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982); *Oakwood Homes*, 2007 WL 2071730, at *2 (denying motion to withdraw reference where "considerations of uniformity in bankruptcy administration support the proceeding being heard in the Bankruptcy Court, because the Adversary Proceeding is a core proceeding that is integral to the restructuring of debtor-creditor rights").  Therefore, the core nature of the proceedings and the related *Pruitt* factors – including promoting uniformity in bankruptcy administration, avoiding confusion, fostering the economical use of limited debtor and creditor resources, and expediting the bankruptcy process – strongly militate against withdrawal of the reference.

### B.      Withdrawal of the Reference Will Not Expedite The Debtors' Chapter 11 Bankruptcy Case

Furthermore, it cannot be disputed that transferring the Adversary Proceedings and consolidating them with the DC Action will "disrupt the progress of the case by slowing reorganization efforts." *See Smith Corona*, 205 B.R. at 716 (declining to withdraw reference of core claims "more prudently left to the experience of the Bankruptcy Court"); *see also Continental Airlines*, 138 B.R. at 447-8 (finding no cause to withdraw the reference because

39

"withdrawal may slow down the bankruptcy process or create confusion" and the "Bankruptcy Court would need to delay any action relating to the assets of the estate until this issue is resolved by this Court"). *First*, the DC Action is far less developed – the FDIC answered the Debtors' complaint less than one month ago. Here, by contrast, the parties have appeared before the Bankruptcy Court multiple times in both Adversary Proceedings. In the Turnover Action, the Debtors have survived JPMC's motion to dismiss, have filed their Motion for Summary Judgment of the Turnover Action, and JPMC has answered the Debtors' complaint and asserted counterclaims. In the JPMC Adversary Proceeding, the Debtors have answered and asserted Counterclaims and opposed JPMC's Motion to Dismiss the Counterclaims, among other things. It simply makes no sense to move these proceedings, each concerning significant estate assets, from the Bankruptcy Court – which has been considering these and similar issues since the Debtors filed for bankruptcy almost ten months ago.

*Second*, delaying these proceedings threatens to delay or derail the Debtors' chapter 11 cases. Both Adversary Proceedings concern significant estate assets critical to the Debtors chapter 11 process. The recent amendments to the Bankruptcy Code impose a hard deadline of March 10, 2010 on the Debtors' exclusivity period to file a chapter 11 plan.[32] If the Debtors are paid their Deposits, they will be well-positioned to file and confirm a plan in advance of their exclusivity deadline. Without their Deposits, however, the Debtors will not be able to construct the plan most beneficial to their creditors. Given that in 2008, the median time from filing to the commencement of trial for civil cases commenced in the District Court for the District of

---

[32]    *See* 11 U.S.C. § 1121(d) (imposing 18-month deadline on extensions of debtor's exclusivity period).

Columbia was greater than three years,[33] withdrawal and transfer of these proceedings would likely extend their resolution beyond the Debtors' maximum exclusivity period, threatening the Debtors' control over their chapter 11 cases.

### C.    It Will be More Efficient for the Bankruptcy Court to Resolve the Adversary Proceedings

In support of its Motion, JPMC ignores the abovementioned facts and instead focuses on the potential factual similarities between the Adversary Proceedings and the DC Action, from which it concludes that withdrawal of the reference and transfer would be more efficient and economical.  (Motion at 35-6).  As a threshold matter, as discussed above, JPMC has already (unsuccessfully) sought transfer of the Adversary Proceedings from the Bankruptcy Court and its attempt to relitigate the issue is improper.  As the Third Circuit recently stated, preclusion rules advance "the systemic interest that courts and litigants have in ensuring that the identical parties receive only 'one bite at the apple' on a given issue." *See Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 254 (3d Cir. 2006), cert. denied, 127 S. Ct. 1878 (2007).

Even assuming, *arguendo,* that JPMC could conceivably have the Adversary Proceedings transferred and that the facts and issues in the two actions overlap, any incidental efficiency achieved by withdrawal of the reference and transfer to Washington D.C. is more than outweighed by the significant efficiencies that can be achieved by maintaining these core proceedings in the Bankruptcy Court – where they have been briefed, where the Judge is intimately familiar with the procedural and factual history, where the Bankruptcy Court is better equipped to decide core bankruptcy issues (which the Adversary Proceedings are comprised of), and where they can be expeditiously dealt with to the benefit of the Debtors' estates. *See, e.g., In*

---

[33]    *See* 2008 Federal Court Management Statistics, U.S. District Court – Judicial Caseload Profile (http://www.uscourts.gov/cgi-bin/cmsd2008.pl).

*re Enron Corp.*, 295 B.R. 21, 26 (S.D.N.Y. 2003) (finding it inefficient to withdraw core proceedings from Bankruptcy Court given Bankruptcy Court's involvement in chapter 11 proceedings for months, its familiarity with procedural history and facts surrounding the debtors' collapse, and its experience adjudicating core proceedings concerning fraudulent transfer and avoidance).

In addition to being misguided, JPMC's reliance upon "efficiency" is also insufficient to support withdrawal of the reference. *See, e.g., In re Westmoreland Coal Co.*, 221 B.R. at 515 (holding that the fostering efficiency does not, by itself, constitute "cause" for permissive withdrawal of reference); *see also Matter of Delaware & Hudson Ry. Co.*, 122 B.R. 887, 896-97 (D. Del. 1991) (concluding that "defendants' judicial economy arguments are insufficient to rebut the *DeLorean* presumption (*i.e.*, Congress intended to have bankruptcy proceedings adjudicated in bankruptcy court unless rebutted by a contravening policy) since judicial economy could be achieved in either forum").[34]

Finally, as described *supra*, JPMC's motion is untimely and demonstrates forum shopping. Therefore, *all* five *Pruitt* factors and the core nature of these proceedings unequivocally weigh against granting permissive withdrawal of the reference.

---

[34] Furthermore, the efficiencies that JPMC claims could be gained by withdrawal of the reference, transfer, and consolidation are hypothetical and may never be borne out. For instance, the FDIC has moved to dismiss all of the claims in the DC Action other than those for which the Debtors filed proofs of claim, including the Debtors' claim for avoidance of capital contributions, and, to the extent it is successful, there would be absolutely no efficiencies achieved by transferring the action – only inefficiencies and delay. Moreover, the Bankruptcy Court, upon transfer, would still have to ultimately allow or disallow and administer JPMC's more than 40 proofs of claim that it willingly filed. Finally, there is no risk that JPMC will be subject to inconsistent judgments, because as the Bankruptcy Court recognized, JPMC is not a party to the DC Action in which the Debtors assert claims only against the FDIC. *See* Tr. 6/24/09 at 94-95 ("The two actions are not between the same parties dealing with the same claims. The action in the D.C. Court is between the debtor and the FDIC, and involves claims the debtor has against the FDIC, which it could not bring here, because they must be brought in the D.C. Court. The actions here involve claims against JPMC, which is not an institution in receivership.")

## CONCLUSION

For the reasons discussed, Debtors respectfully request that the Court deny JPMC's

Motion.

Dated: July 8, 2009        **ELLIOTT GREENLEAF**
       Wilmington, Delaware

                                                _____
                                                Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
                                                Neil R. Lapinski (DE Bar No. 3645)
                                                Shelley A. Kinsella (DE Bar No. 4023)
                                                1105 North Market Street, Suite 1700
                                                Wilmington, Delaware 19801
                                                Telephone:  (302) 384-9400
                                                Facsimile:  (302) 384-9399
                                                E-mail:  rxza@elliottgreenleaf.com
                                                E-mail:  nrl@elliottgreenleaf.com
                                                E-mail:  sak@elliottgreenleaf.com

                                                -and-

                                                QUINN EMANUEL URQUHART
                                                OLIVER & HEDGES, LLP
                                                Peter E. Calamari
                                                Michael B. Carlinsky
                                                Susheel Kirpalani
                                                David Elsberg
                                                51 Madison Avenue
                                                New York, New York 10010
                                                Telephone:  (212) 849-7000
                                                Facsimile:  (212) 849-7100

                                                *Special Litigation and Conflicts Co-Counsel to Washington Mutual, Inc. and WMI Investment Corp*

44